THE JOHN A. CARNIE.

THE OLINDA.

ANDRESEN v. THE JOHN A. CARNIE.

*(District Court, E. D. New York. February 18, 1892.)*

TUGS AND TOWS—STEAM-SHIP IN TOW—COLLISION WITH PIER—RESPONSIBILITY.

In hauling a steam-ship, with steam up, out of a basin, it is the usual practice to have a single tug haul her stern foremost on a hawser, the vessel to check her stern-way, if too great, by going ahead on her own engine. The steam-ship Olinda was being so taken out of the Atlantic basin when her stern struck one of the piers of the outlet, doing damage for which this libel against the tug was filed. It appeared

that her master and a pilot were on the bridge, also that her screw had been going full speed astern for a time before the collision. On conflicting evidence, *held* that the master of the steam-ship, not the master of the tug, was in charge of the ship's engines, and was responsible for the excessive sternway caused by the steamer's backing "full speed" astern, which was the proximate cause of the collision; that the navigation of the tug was in no way improper; and that the libel against her should be dismissed.

In Admiralty. Suit by owner of steam-ship Olinda against the steam-tug John A. Carnie to recover damages caused to the steam-ship by colliding with a pier while in tow of the tug. Libel dismissed.

*Wing, Shoudy & Putnam*, for libelant.

*Carpenter & Mosher*, for claimant.

BROWN, District Judge. About half past 9 o'clock in the morning of November 4, 1890, the libelant's steamer Olinda, while being towed stern first out of the Atlantic basin by the steam-tug John A. Carnie, ran against the outer corner of the southern pier of the outlet, thereby breaking her propeller blades, bending her rudder and doing other damage, for which the above libel was filed. The tide was the first of the flood, running up at the rate of about a knot an hour. The Carnie had made fast her hawser of from 20 to 25 fathoms to the port quarter of the Olinda. The steamer was of 1,020 tons register, 250 feet long by 36 feet beam, and 17 feet deep. She was light, in water ballast, and had steam up all ready for sea.

The testimony shows that the usual practice in hauling out of the basin is to employ but a single tug when the vessel has the use of her own steam; the tug pulls the vessel out stern first, and the vessel is to check her sternway, if too great, by the forward turning of her own engine. If the steamer has not steam up, one or more additional tugs are employed, which are lashed alongside the steamer to check her way, if too great, and to counteract any sheer of the steamer. In the latter case, the captains of the tugs along-side, according to the testimony of the claimants' captain, have charge of the navigation of the steamer; while in the former case, where there is but a single tug forward on a hawser, her duty is only to pull on the steamer, while the officers of the latter exclusively have the charge and management of her helm and engines; and he further testifies that in such cases the steamer should not increase her own sternway at all by working her engines astern, but should leave the hauling astern solely to the tug, and only work her own engines *ahead* to check her sternway, if necessary.

In the present case the evidence shows that the steamer, assisting by some backing of her own engine, was hauled right to go straight through the outlet until she got near to the gap, when she took a sheer to the southward towards the southerly pier; that to prevent collision her engines were then put ahead full speed, and her helm to port; but that either through too rapid sternway, or delay in the forward action of her engine, there was not time to check her way sufficiently to prevent collision, though she came within a couple of feet of clearing. The tug was already angling to the northward as was proper, and when it was seen that the vessel was likely to strike the pier, the tug pulled ahead sharply in a northerly direction away from the pier in order to haul the

stern away; although the captain of the steamer shouted to the tug to stop. It is impossible for me to say which of these contrary orders would have been best; but I am satisfied that the sharp pull of the tug away from the dock was not the cause of the collision, and that it would have occurred just the same had the tug stopped; and that the tug was pulling in the right way to check any sheer to the south, and that there would have been no difficulty but for the excessive sternway caused by the steamer's engine going full speed astern.

The chief questions in the case, and the only remaining ones are, who is responsible for this excessive sternway; and whether the tug, or the steamer, is to be held answerable for the management of the steamer's engine under the circumstances stated. The captain of the steamer testifies in a general way that all his orders to the engine were received from the captain of the tug, who gave them verbally and by motions with his hands. But in neither of his accounts of specific orders, does he say that the tug captain ever told him "full speed astern." The pilot of the tug, on the contrary, who stood upon the after part of the tug, testifies that he gave no orders whatsoever in relation to the management of the steamer's engine, or of her helm; that he had no charge or responsibility in respect thereto; that his only orders and motions were to his mate in his own pilot-house, except that when he saw that the steamer was getting too much sternway, he checked his own tug, so as to slacken his hawser; and that as soon as he noticed the sheer, and that collision with the pier was likely, he shouted to the steamer and signaled by hand to put the steamer's engine ahead full speed; that he did not previously give any direction to the steamer in reference to her engines, though she was coming back rather fast, because he supposed that the captain and the Sandy Hook pilot, both of whom were on the bridge, knew what to do and how to manage her. Mr. Weaver, the Sandy Hook pilot, who was accustomed to hauling out of the basin, says that though he had gone on board to take the ship out to sea, he was not in command while in the basin, and had nothing at that time to do with the navigation of the ship, or giving orders; but that when he saw the ship take a sheer and likely to hit the abutment, he said to the captain that he had better go ahead and put the wheel to port.

The second engineer, who was at the engine, testifies that he kept a record of the working of the engine in going out; it was produced at the hearing, and the following is a copy of the record:

| | |
|---|---|
| 9:41 A. M. slow astern. | 9:49 A. M. stop. |
| 9:43 " stop. | 9:50 " full speed ahead. |
| 9:45 " slow astern. | 9:52 " stop. |
| 9:46 " full speed astern. | |

The witness testified that the figure 9 in the above "49" min. was a figure 7. The 9 is perfect, showing no resemblance to the figure 7, and it is difficult to credit the witness in this very material point. The last order to stop at 9:52 was just after he felt the blow of the collision. As regards the time between the order "full speed ahead" and the collision, he says: "I can't say just the time, but about half a minute; the engine was working a minute or a half a minute."

In the present case the responsibility for the management of the engine of the steamer must be held to lie with her own officers, and not with the captain of the tug. It is unnatural and unreasonable to suppose that when the officers and pilot of the steamer are on the bridge to give orders in respect to hauling out of such a place, the management of the engine of the steamer, by so many changing orders at short intervals, should be undertaken by the pilot of a tugboat at so great a distance. The engineer's record shows seven different orders, with as many changes in the movement of the engine. All the orders to the engineer were given from the steamer's bridge by the captain of the steamer; and the bridge must have been about 250 feet from where the captain of the tug stood on his boat. It is moreover, scarcely probable that when the tug captain had checked the tug's speed so that his hawser was slack in the water, he should have sought to increase the steamer's way astern by ordering her engine "astern full speed," which was the order that caused collision. The captain of the tug, as I have said, strenuously denies giving any such orders, and contends that it was the business of the ship not to move her own engines at all, except to move them *ahead* as might be necessary to check too great sternway, or to correct any sheer.

Had the captain of the tug given these numerous orders, either by words or by signs, in reference to the engine or to the helm, the orders must have been observed by the second mate and by the seamen who, as the testimony shows, were at the stern of the steamer. None of these witnesses have been called to confirm the captain of the steamer, as would naturally have been done if they had heard any such orders. Nor does the pilot give any confirmation of the master's testimony; for the only motions he speaks of as made by the captain of the tug, relate to going ahead after the sheer was seen. Nor does any other witness say that the management of the steamer's engine is understood to be under the direction of the tug in cases like the present. The hail given by the captain of the tug at the last moment when collision seemed likely, has no weight on this point. The nearly universal practice in foreign ports is to treat the tug in such cases as the servant of the steamer when her officers are on board and have the use and the immediate direction of their own power, as in this case. The captain of the tug, moreover, testifies that if he were charged with the management of the steamer's engine and helm, his proper place would be on the steamer.

My conclusion is that the management of the steamer, so far as depended upon the use of her own engine in this case, was with her own officers, and not with the tug; that the collision arose from too great sternway caused by running the steamer's engine full speed astern for a period of at least one minute, if not for three minutes, (till 9:49;) and that for this the steamer, and not the tug, is responsible.

The course of the steamer so near the southerly pier is explained to have been necessary and in accordance with the usual custom for the purpose of avoiding the danger of being swung against the northerly abutment upon entering the flood tide outside of the gap. No fault appearing in the tug, the libel must be dismissed, with costs.